# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MAY 24, 2007
NOT TO BE PUBLISHED

𝔖𝔲𝔭𝔯𝔢𝔪𝔢 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔎𝔢𝔫𝔱𝔲𝔠𝔨𝔶

2005-SC-000840-MR

PAUL DAVID SMITH                                                 APPELLANT

V.
                     APPEAL FROM WHITLEY CIRCUIT COURT
                           HON. PAUL E. BRADEN, JUDGE
                               NO. 03-CR-00108-001

COMMONWEALTH OF KENTUCKY                            APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Appellant, Paul David Smith, was convicted of complicity to murder and robbery by the Whitley Circuit Court and sentenced to fifty years' imprisonment. He appeals to this Court as a matter of right, asserting three errors. Finding no error, we affirm.

**Facts**

Appellant was convicted of complicity to the murder of Glenn David Riggleman on July 28, 2005. Riggleman was the ex-husband of Appellant's wife, Denise Smith. The evidence presented at trial established that Denise Smith had an extremely acrimonious relationship with her ex-husband following a bitter divorce and custody dispute, marked by claims of Riggleman's physical and verbal abuse of his wife. Though Denise had been awarded custody of the children, legal disputes concerning visitation and child support continued. The disputes escalated when, according to Denise, Riggleman began mistreating the children during visitation. She alleged that one of her children returned home with bruises inflicted by Riggleman. Appellant's

dislike of Riggleman was well-known, as the two had argued publicly outside of the courthouse following a hearing concerning visitation. Shortly thereafter, Riggleman was found shot to death outside of his home.

The Commonwealth's theory of the case was that Appellant had committed the murder with the help of his nephew, Travis Wagers, after his other nephew, Jason Wagers, declined to assist in the crime. According to Jason's testimony, Appellant spoke to him several times about his dislike for Riggleman and his desire to get him "out of Denise's life." Eventually, Appellant relayed to Jason a more specific plan. He told Jason that he would use a shotgun because projectiles could not be matched to any specific firearm. He revealed that he would check Riggleman's work schedule and kill him before he left for work, leaving ample time for Appellant to return to his own home before Denise's children would wake up. Appellant asked Jason to help him establish an alibi, but Jason refused.

Appellant then sought the assistance of Jason's younger brother, Travis. Though Travis refused to actually commit the murder, he did agree to help Appellant. The two agreed that Travis would spend the night at Appellant's house the night before the murder and leave early the next morning in Appellant's truck. The plan was for Travis to drop Appellant off so that he could ambush Riggleman as he left for work, steal Riggleman's truck, and then reunite at an abandoned church nearby. Thereafter, the plan was to hide Riggleman's truck and for both men to return home quickly in order to establish an alibi. Appellant also instructed Travis to wear an extra, outer layer of clothing in case there was blood.

The evidence presented at trial revealed that Appellant and Travis followed this plan. Travis' mother confirmed that, the night before the murder, Appellant picked up

Travis at home and that he spent the night with Appellant. Later that evening, Appellant donned rubber gloves and proceeded to thoroughly clean his 20-gauge shotgun and several 20-gauge slugs. Forensics testing later revealed that Riggleman died as a result of two gunshots consistent with a 20-gauge shotgun.

Several neighbors testified that they heard gun blasts at approximately six o'clock in the morning, the time Riggleman would be departing for work. Lola Hall, a neighbor, saw a vehicle backing down the hill towards the main road immediately after the gunshots. She testified that the headlights looked light those on Riggleman's pick-up truck. Another neighbor, Nicole Stevens, testified that she saw two vehicles pull out of Riggleman's driveway that followed each other briefly before splitting up in opposite directions.

According to Travis' testimony, he dropped Appellant off near Riggleman's home and went to the abandoned church, where he waited about fifteen minutes. When Appellant appeared, he was pale and silent. The two switched trucks so that Travis was now driving Riggleman's vehicle. Appellant returned home, while Travis drove Riggleman's truck to remote Kensee Hollow to hide it. On the way, Travis discovered that the shotgun and shells were still in the truck. He stopped and tossed the gun into a creek, but did not dispose of the shells. He continued to the hollow, where he parked Riggleman's truck and concealed it with brush and branches. He stopped momentarily to take off the outer layer of clothing he had worn, which he hid under some rocks. Travis then left on foot for his Aunt Sue's home, which was nearby.

When Riggleman's body was discovered later that morning, the police began to investigate the crime and eventually interviewed Travis. He denied any involvement. Three months later, however, he confessed to his mother. Thereafter, he turned himself

into police and gave two statements. In the first, he implicated himself and Appellant. In the second, he implicated Denise Smith. According to Dora Lawson, Appellant's sister and Travis' mother, Travis confessed to her as well. Dora further testified that she confronted Appellant about the crime, whereupon Appellant apologized to his sister for involving Travis in the plot.

Travis, Appellant and Denise Smith were each indicted on one count of murder and one count of robbery in the first degree. Travis pled guilty in exchange for a sentence of twenty-five years' imprisonment and his testimony against Appellant and Smith. Smith and Appellant were jointly tried. Smith was acquitted, while the jury found Appellant guilty of complicity to murder and robbery.

Further facts will be developed as necessary.

### Evidentiary Issues

Appellant first argues that the cumulative effect of six erroneous evidentiary rulings operated to deny him the opportunity to effectively confront adverse witnesses and impeded his ability to present a defense. At the outset, we note that decisions concerning the admission of evidence are left to the sound discretion of the trial court, and will only be overturned where an abuse of discretion has occurred. Commonwealth v. English, 993 S.W.2d 941, 945 (Ky. 1999). A trial court abuses its discretion when the decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. Id.

*David Chadwell testimony*

Appellant complains that he was denied his due process right to present a defense by the exclusion of evidence that Travis had a motive to commit the murder independent of Appellant's reasons. Through the testimony of David Chadwell, defense counsel wished to establish that Travis committed the murder alone in order to steal

- 4 -

Riggleman's truck and sell it for drugs. The trial court sustained the Commonwealth's objection to this testimony on the grounds that it was irrelevant.

On avowal, Chadwell testified that he had lived with Travis the year before the crime occurred, and had done drugs with him on a regular basis. According to Chadwell, Travis was wild and unpredictable when he used crystal methamphetamine, and that Travis had once told him that he would "shoot a man in the head for drugs" if he had to. He also described that Travis would be extremely desperate if he went without meth for several days. However, Chadwell limited his own testimony by repeatedly stating that he did not think Travis was serious when he made these statements, and that he believed it was "just the drugs talking."

Appellant contends that Chadwell's testimony was admissible as probative of his defense theory that Travis committed the murder for drug money. The due process clause affords a criminal defendant the right to fair opportunity to present and develop a defense. Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986). A proper defense includes the right to admit evidence that someone else committed the crime. Beaty v. Commonwealth, 125 S.W.3d 196, 207 (Ky. 2003). However, "evidence is not automatically admissible simply because it tends to show that someone else committed the offense." Beaty, 125 S.W.3d at 208. A trial court may limit such evidence when the defense theory is unsupported, speculative and "far-fetched" and could, therefore, confuse or mislead the jury. Commonwealth v. Maddox, 955 S.W.2d 718, 721 (Ky. 1997). We have stressed that evidence of an alternative perpetrator is only admissible where it is well established that this other person had both the motive and the opportunity to commit the crime. Beaty, id. at 208.

This case is positioned differently than our previous decisions concerning so-called "reverse 404(b) evidence." Here, Travis had already admitted his involvement in the crime. Thus, while Travis' *opportunity* to commit the crime was conceded, defense counsel sought to establish an alternative *motive* through Chadwell's testimony. Upon review of the record, we find no abuse of discretion in the trial court's decision to exclude Chadwell's testimony.

We are persuaded, primarily, by the generic and vague nature of Travis' statements to Chadwell. While he allegedly stated that he would "shoot a man in the head" over drugs, he did not direct that threat specifically at Riggleman nor did he elaborate on a particular plan or intention. Chadwell was insistent that this comment was a "figure of speech" or mere posturing by Travis; it was not made in the context of a specific plan. Furthermore, as noted by the trial court, the conversations between Chadwell and Travis had occurred sometime in the year before the crime, making it unlikely that Travis was referring to a specific plan to kill Riggleman when he made the statements. Moreover, while Appellant argued that Travis' motive might have been to steal Riggleman's truck for drug money, there was no other evidence in the record to support that theory. Travis testified that he never intended on selling Riggleman's truck and, in fact, simply abandoned it in the woods following the crime. There was likewise no evidence that Travis was, in fact, on methamphetamines at the time of the crime, or that he was in a desperate state of withdrawal. Finally, we cannot ignore that Chadwell's avowal testimony contained absolutely no facts establishing personal knowledge that Travis killed Riggleman, alone, for drug money.

We agree with the trial court that Chadwell's avowal testimony was too remote and speculative to be admitted. There was no abuse of discretion.

*Prosecution Letter*

Appellant next argues that the trial court erroneously excluded a letter from the Commonwealth's Attorney directed to Travis' attorney, regarding his plea negotiations. When questioning Travis about his guilty plea, defense counsel asked if he remembered seeing a letter to his attorney indicating that the Commonwealth may begin looking at Travis as the shooter. Though the letter has not been made part of the record before this Court, the record does indicate that the letter discussed the death penalty as a possible punishment in Travis' case. The Commonwealth objected to introduction of the letter, and the trial court sustained the objection. The trial court stated that it would allow inquiry into Travis' plea agreement, but would not allow questioning specifically about the letter because it involved speculation as to the Commonwealth Attorney's mental impressions and intentions with respect to Travis' case.

Appellant now argues that he was denied the opportunity to establish Travis' real motive for implicating his uncle in the crime – to avoid the death penalty – and that he was denied effective confrontation as a result. Without specifically determining if the trial court erred or if Appellant's confrontation rights were violated, we can conclude that any supposed error is harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) ("[W]e have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."); RCr 9.24. When cross-examined by counsel for Denise Smith, Travis specifically stated that he was avoiding the death penalty by testifying against Denise and Appellant. In fact, Travis further elaborated that he avoided even a life sentence. Therefore, the jury was well aware that the death

penalty had been discussed, and that Travis' plea agreement was for twenty-five years' imprisonment. Moreover, defense counsel's closing argument addressed the issue of Travis' plea agreement, making clear to the jury that Travis might have falsified his story in order to avoid harsher punishment. The error, if any, was harmless.

*Travis' Motion to Suppress*

Appellant challenges the exclusion of a motion to suppress statements that Travis made to police prior to his ultimate confession. At trial, defense counsel sought to establish Travis as the shooter, who later implicated Appellant to avoid the death penalty. To this end, defense counsel questioned Travis extensively about his decision to plead guilty, drawing attention to the lengthy period between Travis' arrest and his ultimate confession. During cross-examination, defense counsel asked Travis if his attorney had tried to "get the charges tossed out" through a motion to suppress Travis' statements to police. He responded that he could not remember. Defense counsel asked the question again, and the Commonwealth objected, challenging relevancy. Defense counsel responded that the motion to suppress was inconsistent with the Commonwealth's argument that Travis decided to "come clean" by confessing, and sought admission of the motion for impeachment purposes.

The trial court sustained the objection, concluding that the motion was not probative of Travis' motive for confessing, particularly in light of his testimony that he did not even remember the motion. We agree that the actions taken by Travis' attorney were irrelevant in this instance. Moreover, there is no indication that Appellant's right to present a defense or his confrontation rights have been infringed upon. Defense counsel was able to fully cross-examine Travis regarding the motive behind his confession, and he was therefore not prejudiced by this very minor limitation. <u>Van</u>

- 8 -

Arsdall, 475 U.S. at 680, 106 S.Ct. at 1435 ("[T]he focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial."). Through cross-examination, the jury was made well-aware of the lengthy period of time between Travis' arrest and his confession, and the possibility that Travis confessed simply to avoid harsher punishment. The admission of the motion to suppress would not have left the jury with a "significantly different" impression of Travis. Id. Appellant's confrontation rights were not infringed upon, nor did the trial court abuse its discretion in excluding the motion.

*Marcia Smith Testimony*

Attorney Marcia Smith represented Riggleman in his divorce and custody actions. Because the Commonwealth argued that Appellant killed Riggleman as a result of the contentious divorce, Smith was called to testify regarding those proceedings and to establish that Appellant and Denise Smith had access to Riggleman's work schedule. At the outset, the trial court made clear that Smith would be permitted to testify regarding her actions in the matter, but could not provide hearsay statements by Riggleman.

Thereafter, Smith testified primarily about the custody dispute between Riggleman and Denise Smith, with particular emphasis on the visitation schedule. Defense counsel for both Appellant and Denise Smith objected continually to Smith's responses; several were sustained. However, the trial court did permit some responses that included statements attributed to Riggleman, but only insofar as it was necessary to explain why Smith took various actions in the case. Her testimony was limited to her personal action in the matter. For example, Smith was permitted to state that

Riggleman desired telephone contact with his children as an explanation for why she filed a motion to modify the visitation schedule.

Appellant now argues that the trial court erred to his substantial prejudice by permitting these supposed hearsay statements, resulting in a violation of his right to confront witnesses. According to Appellant, the trial court permitted these hearsay statements under the erroneous belief that the medical and diagnosis exception to the rule against hearsay, KRE 803(4), applies equally to the attorney client relationship. This argument is without merit, as it is based on a blatant misrepresentation of the record.

Though the trial court briefly referred to KRE 803(4) by way of analogy, it is very clear that the essence of the ruling was that Smith's testimony was not, in fact, hearsay because the statements were not offered for their truth. Rather, any statements by Riggleman were provided simply to explain why Smith took certain action in the case. Smith's testimony was limited to only those matters within her personal knowledge. There was no abuse of discretion. Furthermore, Appellant's claim that his confrontation rights have been infringed upon is equally without merit. The Sixth Amendment confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford v. Washington, 541 U.S. 36, 59 n.9, 124 S.Ct. 1354, 1369 n.9, 158 L.Ed.2d 177 (2004).

*Jason Wagers Testimony*

Appellant next argues that the trial court admitted portions of Jason Wagers' testimony in violation of RCr 9.724(1). Jason Wagers testified that he went to Appellant's house after the murder and that during the conversation Appellant "broke down" and said that he "never had wanted to hurt" the Wagers family. Midway through

- 10 -

Wagers' response, defense counsel objected, arguing that the statement had never been provided in discovery. The Commonwealth's Attorney responded that he was equally unaware of the statement. The trial court sustained the objection, and the Commonwealth's Attorney agreed not to pursue the matter further. Defense counsel then moved to strike, which was denied.

RCr 7.24(1) requires the Commonwealth to disclose "any oral incriminating statement known by the attorney for the Commonwealth." Appellant has pointed to nothing in the record that would support the inference that the Commonwealth's Attorney was aware of this statement prior to trial. Therefore, by its plain language, RCr 7.24(1) does not apply in this instance. RCr 7.26 is equally inapplicable as no written or recorded statements are involved. Finally, we note that no prejudice could result from the trial court's refusal to strike the statement, as the jury heard nearly identical information from Appellant's sister, Dora Lawson. There was no error.

*Travis Wagers Testimony*

Appellant's final allegation of error with respect to evidentiary rulings concerns Travis' testimony about a conversation he had with Appellant. Travis provided several taped statements to police following his confession. In one of these taped statements, Travis explained that, a few days after the murder, he went to his uncle's house. Travis further stated that the two discussed "what had happened" and that Appellant "questioned" him about what he had done after they split up outside Riggleman's house.

At trial, the Commonwealth attempted to question Travis about what Appellant had told him during this conversation. Defense counsel objected. During a bench conference, defense counsel conceded that the taped statements had been furnished but argued that the only reference to this conversation was Travis' statement that

- 11 -

Appellant had "questioned" him. According to defense counsel, Travis' statement that Appellant had questioned him was insufficient notice of testimony concerning what Appellant told Travis. The trial court disagreed, concluding that the statement provided sufficient disclosure of an incriminating statement by Appellant. Travis was thereafter permitted to testify that Appellant told him that he shot Riggleman in the back as he exited his home, that Riggleman began moaning, and so he shot Riggleman again in the side of the head. On cross-examination, Travis admitted that he had not provided this detail to defense counsel during a pre-trial interview.

A discovery violation warrants reversal where there is a reasonable probability that the result at trial would have been different had the evidence been disclosed. Weaver v. Commonwealth, 955 S.W.2d 722, 725 (Ky. 1997). Assuming *arguendo* that a discovery violation occurred in this instance, we are confident that no reasonable probability exists that the result at trial would have differed. As noted above, Dora Lawson testified in detail regarding a confession by Appellant to her. Furthermore, the physical evidence established that Riggleman had been shot in the back and in the head. The only new information provided by Travis' testimony is that Riggleman began moaning following the first gunshot. We find no reasonable probability that the result in this trial would have been any different had the jury not been aware that Riggleman moaned during the course of the killing.

*Cumulative Error*

With respect to each of these allegations of evidentiary errors, we have found either that no error existed or that no prejudice resulted. Accordingly, there can be no cumulative error. Sanborn v. Commonwealth, 975 S.W.2d 905, 913 (Ky. 1998).

## Amendment of the Indictment

Appellant complains that he was substantially prejudiced by an amendment to the indictment following the close of evidence. Midway through the defense presentation of evidence, the Commonwealth moved to amend the indictment to include complicity to murder in addition to murder. The motion was granted over defense objection. Appellant now argues that he was prejudiced by the timing of the amendment, as his defense strategy would have been different had he known he would be tried as both a principal and a complicitor.

RCr 6.16 permits amendment of the indictment "any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." "[A]mending the indictment to include an allegation that the defendant is guilty of the underlying charge by complicity does not constitute charging an additional or different offense." Commonwealth v. McKenzie, 214 S.W.3d 306, 307 (Ky. 2007). See also KRS 502.020. "[T]he essential question when examining variance between the indictment and the proof is whether the defendant in fact had fair notice and a fair trial." Johnson v. Commonwealth, 864 S.W.2d 266, 272 (Ky.1993).

Here, there is no doubt that Appellant had fair notice of the complicity charge. Travis Wagers had been charged and pled guilty to murder as a principal, and provided several statements implicating Appellant in the planning and execution of the murder. Furthermore, "[s]ince the late 1800's Kentucky has allowed the conviction for complicity to stand where the indictment charged the defendant as a principal." Epperson v. Commonwealth, 197 S.W.3d 46, 52 (Ky. 2006). Moreover, the Commonwealth did not change its trial strategy mid-way through the proceedings. Cf. Wolbrecht v. Commonwealth, 955 S.W.2d 533, 537 (Ky. 1997). Rather, it is apparent from the record

- 13 -

that the Commonwealth moved to amend the indictment in response to the testimony of Travis Wagers' former cellmate, a *defense* witness who testified that Travis had confessed the crime to him, indicating that he was the triggerman. Finally, it must be noted that defense counsel did not request a continuance to respond to the amended indictment. See McKenzie, 214 S.W.3d at 308-09 (finding defendant had waived argument that he was prejudiced by lack of a continuance following amendment of the indictment where no motion for a continuance was entered). Appellant was neither surprised nor prejudiced by the amended indictment. There was no error.

## Facilitation Instruction

Appellant's final allegation of error is that, once the trial court decided to instruct on complicity, he was entitled to an instruction on facilitation to commit murder as well. Travis had a drug problem and a violent streak, so the argument goes. Appellant knew about his nephew's flaws. It is argued that Appellant complained to his unstable kinsman about his own troubles with Riggleman. Therefore the jury could infer that Travis committed the crime by acting on such information, while the Appellant remained indifferent. This argument, at best, is a stretch. Upon review of the record, we find no error.

While the trial court has a duty to instruct on the "whole law of the case", it is under no duty to instruct on a theory with no evidentiary foundation. Houston v. Commonwealth, 975 S.W.2d 925, 929 (Ky. 1998). We have articulated the difference between complicity and facilitation as follows:

> Under the complicity statute, the defendant must intend the crime be committed; under the facilitation statute, the defendant acts without such intent. Facilitation only requires provision of the means or opportunity to commit a crime, while complicity requires solicitation, conspiracy, or some form of assistance. Facilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime.

- 14 -

<u>Thompkins v. Commonwealth</u>, 54 S.W.3d 147, 150 (Ky. 2001) (internal citations omitted).

Here, there was no evidence to support the conclusion that Appellant was "wholly indifferent" to Riggleman's murder. There is likewise no evidence that Appellant "generally complained" about Riggleman to Travis; rather, all of the testimony at trial established that Appellant complained about Riggleman in the context of a plan to murder him. While the evidence differed as to who was the actual triggerman, neither the Commonwealth nor defense counsel presented any evidence that Appellant was aware of, yet indifferent, to the murder. The evidence presented by both sides supported only three findings: (1) that Appellant was in no way involved in the crime, as defense counsel argued; (2) that Appellant was the principal actor; or (3) that Travis was the actual triggerman but was acting under Appellant's direction and with his assistance. There was no evidence that Appellant merely facilitated Travis in the crime and, therefore, the instruction was properly denied.

## Conclusion

For the foregoing reasons, the judgment of the Whitley Circuit Court is affirmed. All sitting. All concur.

COUNSEL FOR APPELLANT:

Susan Jackson Balliet
Assistant Public Advocate
100 Fair Oaks Lane, Suite 302
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Gregory D. Stumbo
Attorney General of Kentucky

James C. Shackleford
Assistant Attorney General
Office of Criminal Appeals
Office of the Attorney General
1024 Capital Center Drive
Frankfort, KY  40601