# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: JUNE 17, 2010
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2009-SC-000012-MR

ONDRA LEON CLAY                                           APPELLANT

V.

ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE PAMELA GOODWINE, JUDGE
NO. 07-CR-00463

COMMONWEALTH OF KENTUCKY                      APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

Appellant, Ondra Leon Clay, was convicted of first degree rape and first degree sodomy and sentenced to thirty years' imprisonment. Appellant appeals his convictions as a matter of right. Ky. Const. § 110(2)(b).

## I. Background

In 1997, a man grabbed S.R. from behind while she was walking to work and threatened to kill her if she tried to run away or to look at him. The man pressed against her neck a cold hard object that she believed to be a gun. The man penetrated S.R. from behind and then ordered her to turn around and get on her knees. The man forced his penis into S.R.'s mouth and told her that if

she bit him, he would kill her. He ejaculated inside her mouth. Afterwards, he demanded that she leave, and she ran away.

S.R.'s father found her in the living room that morning, sobbing. It took several minutes for him to understand that she was telling him that she had been raped. Once he understood, her father put her in the car and drove her around the neighborhood looking for the assailant. When they could not find the man, S.R.'s father took her to the UK Medical Center Emergency Room. S.R. told the staff that she only got a glimpse of her attacker and could not identify him.

Dr. Michael Stava and Nurse Teresa Stevens treated S.R. in the emergency room. She told Dr. Stava and Nurse Stevens that a man had penetrated her both vaginally and in her month. She did not know if the man ejaculated during the rape, but that he did ejaculate in her mouth and she had been "spitting" since the attack. The doctor swabbed the vagina and the inside of the mouth. They also swabbed suspected semen from S.R.'s thigh, collected pubic hair combings, and plucked hair from her head. The suspected semen was swabbed approximately one and a half hours after S.R.'s father found her on the living room floor.

The police did not send material to the Kentucky State Police Lab for testing, because the KSP lab (in 1997) did not routinely test for DNA if there was no identified suspect for the crime. Therefore, the evidence collected remained untested and the alleged rape and sodomy went unsolved for years.

In 2005, the KSP lab received a federal grant to review evidence in "cold cases." Under the grant, the KSP analyzed evidence for the presence of sperm and, if present, would forward the evidence to Orchid Cellmark to extract the DNA profile. In this case, semen was present on the vaginal swab and Orchid Cellmark determined that there was DNA from an unknown male.[1] Orchid Cellmark then sent the DNA profile to the KSP lab and it was entered into the CODIS database.[2] The lab got a "hit" on Appellant's DNA profile, which had previously been entered into CODIS.[3] The KSP lab then obtained a sample of Appellant's DNA and compared the profile with that obtained from the vaginal swab. Appellant's profile matched the evidence at all 13 loci.

Appellant admitted that he had intercourse with S.R. but claimed that it was consensual. He denied her allegations regarding oral sex. Appellant was tried on one count of rape and one count of sodomy which ended with a hung jury.

In both the first and the second trials, the Commonwealth called Nurse Stevens and Marcie Atkins as witnesses. Atkins was a Forensic Science Specialist II with the Forensic Biology Department of the KSP who performs

---

[1] The lab also extracted DNA from the vaginal swab and attributed it to a "minor contributor." Orchid Cellmark determined that S.R. could not be excluded as the minor contributor.

[2] CODIS is an acronym for "Combined DNA Index System."

[3] Appellant's DNA was in the database, because during the period between S.R.'s assault in 1997 and the "hit" on CODIS in 2005, Appellant was charged and convicted of the rape and murder of a young woman in Fayette County and sentenced to Life Without Parole for 25 Years. *See Clay v. Commonwealth*, 291 S.W.3d 210 (Ky. 2008). Appellant was serving the life sentence (and the concurrent sentence for rape) at the time of the charge and conviction in the instant action.

both serological and DNA testing for the agency. In both trials, Appellant objected to the introduction of these witnesses' opinions, arguing that the testimony was "speculative," and that the witnesses were not qualified to give expert opinions. In the first trial, the court overruled Appellant's objections stating that it would allow Stevens to "answer basic questions." In the second trial, the court indicated that it would allow the testimony for the same reasons as stated before. Stevens then proceeded to testify regarding biological processes of the human mouth. Atkins answered questions regarding why, or why not, semen may be detected on a swab from the mouth.

The second trial resulted in convictions on both the rape and sodomy charges, and the jury recommended a twenty-year sentence for rape and a ten-year sentence on the sodomy, to run consecutively. The Commonwealth wanted Appellant's sentences to run consecutively with his life sentence while Appellant argued that the sentences for rape and sodomy should not run consecutive with his life sentence. The trial court was concerned that Appellant might ultimately be sentenced to less than life as the previous murder and rape convictions were still on appeal. Thus, the trial court sentenced Appellant to 30 years for rape and sodomy to run consecutive with his previously imposed sentence of Life Without Parole for 25 years (LWOP25) for rape and murder.

## II. <u>ANALYSIS</u>

### A. The Trial Court Did Not Err In Ordering That the Term of Years Sentence Run Consecutively with the Life Sentence

Appellant contends that the sentencing issue is "at least partially preserved." At sentencing, Appellant argued that it was error to run the 30-year sentence consecutive with the previously rendered life sentence. The lower court told Appellant that it would "adjust" the sentence if Appellant could point to current law supporting his position. The court gave Appellant the opportunity to "brief" the sentencing issue, but nevertheless rendered the sentence at that time. As Appellant failed to take advantage of the trial court's invitation to file a brief, the Commonwealth suggests that the sentencing issue was not preserved.[4] We disagree. RCr 9.22

The parties agree that the controlling statutes are KRS 532.110, addressing multiple sentences, and KRS 532.080, which deals with sentence enhancements for a persistent felony offender. Together, these statutes limit the time that aggregate indeterminate sentences may run – which is the time that a PFO sentence may be imposed for the *offense of conviction*, or, at the most, 70 years.

This Court initially held that the statutes did not prohibit a sentence for a term of years from being run consecutively with a capital murder sentence,

---

[4] Appellant relies on *Yarnell v. Commonwealth*, 833 S.W.2d 834 (Ky. 1992) and *See v. Commonwealth*, 746 S.W.2d 401 (Ky. 1988) in support of his argument that the trial court erred in running the term of years sentence with the previously imposed LWOP25.

*see Rackley v. Commonwealth,* 674 S.W.2d 512 (Ky. 1984), but later found that a sentence for a number of years *cannot* run consecutive with a life sentence, whether in a capital case or not. *See Bedell v. Commonwealth,* 870 S.W.2d 779, 783 (Ky. 1994); *See also Mabe V. Commonwealth,* 884 S.W.2d 668 (Ky. 1994); *Wells v. Commonwealth,* 892 S.W.2d 299 (Ky. 1995).

The Commonwealth argues that the *Bedell* line of cases differ from the instant action because, in the previous cases, the term of years sentence and life sentence were imposed as a result of the *same trial,* whereas here, Appellant's sentence of 30 years was ordered to run consecutively with a life sentence imposed from a *previous trial.* The Commonwealth contends that we recognized this distinction in *Stewart v. Commonwealth,* 153 S.W.3d 789, 792 (Ky. 2005).

In *Stewart,* the defendant was convicted of rape and burglary and was sentenced to a term of ten years in 1985, and was paroled in 1990. While on parole, Stewart committed first-degree robbery. He appeared on the parole violation and was given a serve-out on the original sentence. Later, he was convicted on the robbery charge as well as for being a persistent felony offender. His enhanced sentence for those crimes was life in prison. Stewart appeared before the parole board in 2001.[5] 153 S.W.3d at 791.

Stewart argued that he had served his ten year sentence for rape by 2001. Relying on *Bidell* and *Mabe,* the Court of Appeals found that Stewart's

---

[5] The dispositive issue of the case was whether the Parole Board had the authority to rescind its recommendation to grant parole to Stewart – not the calculation of multiple sentences.

sentence for rape and the life sentence must run concurrently with one another and thus rejected the argument that he had served out his ten year sentence by 2001. *Id.* at 792.

In *Stewart*, we rejected the lower court's decision to apply *Bedell* and its progeny, finding that "[a]ll of those cases involved situations where the defendant had been convicted at *the same trial* of crimes where one sentence was for a term of years and the other for life."[6] *Id.*

The Commonwealth argues that if we do not now follow *Stewart*, we will adopt an "absurd application of law where a defendant's total sentence is dependant solely on the order of conviction," and, in this case, will create a potential "windfall" for Appellant. Appellant, on the other hand, opines that *Stewart* does not apply here, as his life sentence was rendered *before* the term of years sentence.

Yet, the applicable statutes do not differentiate between aggregate sentences rendered in one action and "combining" one sentence from one trial with a second sentence adjudged in a later, separate trial. In *Stewart*, this Court held that running a life sentence rendered in one trial consecutive with a

---

[6] We also note that, unlike *Bedell* and the other cases like it, Stewart had received a serve out date on the term of years sentence before he was sentenced to life. The Court reasoned that Stewart would not "start serving a life sentence until after he finished his the term of years." *Stewart*, 153 S.W.3d at 792.

term of years sentence *previously* rendered in a separate trial was appropriate.[7]

*Id.*

Appellant suggests that whether life and term of years sentences may run consecutively is dictated by the *order* in which the sentences were rendered – that is, if the life sentence is rendered in a separate trial *before* the term of years sentences, as in this case, then *Bedell must apply* and the sentences cannot run consecutive to each other, but if the life sentence is rendered in a separate trial *after* a term of years sentence, then we may apply the logic of *Stewart.* This is not the case. *Stewart* did not fashion a rule that is dependant upon whether the life sentence was rendered in the first trial or the second trial.

Read together, KRS 532.110 and 532.080 apply to sentences rendered in the same action for separate offenses. Thus, it is improper to run a life sentence consecutive with a sentence for a term of years because to do so would be in direct contravention of KRS 532.110(1)(c). In this case, however, we have an *earlier* existing life sentence that was properly ordered to run concurrently with a term of years sentence for rape (from the same, *earlier,* trial) *and* two term of years sentences rendered for the rape and sodomy convictions in the present case. Therefore, the rule handed down in *Bedell* does not apply in this instance. Thus, the judgment ordering Appellant's

---

[7] This Court did not overrule *Bedell* and its progeny in *Stewart.* To the contrary, while we commented on factual distinctions, we cited *Bedell,* noting "it is true that it is *improper to order a term of years* sentence *to run consecutively with a life sentence."* *Stewart,* 153 S.W.3d at 792. (emphasis added).

twenty-year sentence and ten year sentence for rape and sodomy to run consecutively with each other *and* to the LWOP25 sentence for murder that was rendered in a prior, separate case, is not error and is therefore upheld.

### B. Allowing Testimony of Nurse Stevens and Marcie Atkins Was Not an Abuse of Discretion

A trial court's ruling as to the admissibility of evidence is reviewed under an abuse of discretion standard. The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). Appellant argues that the trial court abused its discretion when it failed to conduct a *Daubert* hearing *sua sponte*, and failed to make a determination of the testimony's reliability on the record.[8] Appellant also asserts that the court's decision to allow the testimony lacks "reasonable support in the record." Appellant's primary argument is that neither witness was qualified to tell the jury how long semen would stay in the mouth or whether semen would be "spit out" and thus dissipated within one hour and fifteen minutes. We disagree.

The Commonwealth contends that the testimony at issue contained "unremarkable facts" and suggests that the content was such that the court could have taken "judicial notice" of the facts or opinions testified to. The

---

[8] Appellant refers to the test, now commonly known as a *Daubert* hearing, set forth in the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993), which requires a trial court to test the relevance and reliability of expert testimony by applying various factors to the testimony offered.

Commonwealth also asserts that the trial record was more than sufficient to support the relevance and reliability of the testimony offered.

While Appellant's objections to the testimony of Stevens and Atkins were sufficient to preserve this issue on appeal, Appellant did not specifically ask the court to conduct a *Daubert* hearing. We are not inclined to find that a court must conduct a formal *Daubert* hearing *sua sponte* each time that the admissibility of expert testimony is challenged. *See Mondie v. Commonwealth*, 158 S.W.3d 203, 212 (Ky. 2005); *Tharp v. Commonwealth*, 40 S.W.3d 356, 368 (Ky. 2000). A trial judge has wide latitude in investigating and determining reliability of evidence, *Dixon v. Commonwealth*, 149 S.W.3d 426, 430 (Ky. 2004), and the record need only be "complete enough to measure the proffered testimony against the proper standards of reliability and relevance." *Commonwealth v. Christie*, 98 S.W.3d 485, 488 (Ky. 2002).

While neither Stevens' nor Atkins' testimony addressed any complex scientific theory or rule, it did edge just beyond that likely known by a layperson and was therefore "expert" testimony.[9] Thus, it is important to know the content of the witnesses' testimony.

Stevens walked the jury through the administration of the rape kit. She explained that they swabbed the mouth because S.R. "said that she was assaulted in her mouth." She very specifically described how they swabbed S.R.'s thigh, mouth, and vagina, and how and why she plucked hairs from

---

[9] Most people are not aware of the function of enzymes in the mouth, or that the mouth and rectum are harsh environments for semen.

10

S.R.'s head. After she testified that she had been trained and educated about the natural processes of the body, Stevens testified:

> A. People are constantly making new saliva and secreting digestive enzymes to fight bacteria and germs in the mouth.
>
> Q. What does a body do to get rid of it?
>
> A. You swallow to get rid of it.[10]
>
> Q. If a person ejaculates into another's mouth and that person spits it out, and they come to the hospital, based on what you talked about, the saliva and the body's processes, would you always expect to find semen or some evidence of the ejaculate there in the mouth?
>
> A. No

The prosecution established that Stevens was qualified to discuss the "processes of the body" insofar as she testified – that the mouth produces saliva and enzymes. She was a registered nurse of 23 years. In his objection, Appellant argued that this testimony was "outside of her expertise" because she would not know "how long something should be there" (in the mouth) or "whether someone's actions in spitting would affect anything."

However, Stevens did not opine as to how long semen might stay in the mouth given the processes of the saliva and enzymes produced there, nor did she discuss the effects of spitting on its retention. She said this is a process inside of the mouth and *agreed* that given that process, in combination with

---

[10] Next, the prosecutor asked her if "people spit" and she answered "Yes." Although objected to, this is in no way "expert" testimony.

11

the act of spitting, a nurse would not *always* expect to find semen in the mouth. As the trial record supported these brief, somewhat innocuous, opinions, Stevens' education, training, and experience were basis enough for the trial court to admit this testimony.

As for Atkins, Appellant objected "[s]peculation," "no training specific to this," when the prosecution asked:

> Q.    What may be reasons why here wouldn't be semen on oral swabs from the mouth?
>
> A.    Both oral and mouth cavities are harsh environments for semen. Sometimes we find sperm there, sometimes we don't.

Notably, Atkins' "opinion" on this subject lasted twenty-seven seconds. Before that, she very carefully explained KSP's procedure for processing swabs as evidence, how it reports DNA differently than Orchid Cellmark, and fully explained her duties as a lab specialist. She testified that she had been a specialist with the KSP crime lab for ten years, that she had a Bachelor of Science Degree from UK, and that she had trained with the FBI at Quantico.

Given Atkins' training and experience, we hold that the trial judge did not err by allowing this testimony. The judge said on the record that she would allow the women to answer "basic questions," and that is what she allowed – their answers being supported by their training, education and experience, all of which were uncontested, and on the record. Thus, the trial court did not abuse its discretion by allowing the testimony of Stevens and Atkins.

# III. **CONCLUSION**

Therefore, for the reasons stated above, Appellant's conviction for rape and sodomy, and the judgment ordering his sentence, are affirmed.

All sitting. Minton, C.J.; Abramson, Cunningham, Schroder, and Scott, JJ., concur. Noble, J., concurs, in part, and dissents, in part by separate opinion in which Venters, J., joins.

NOBLE, J., CONCURRING, IN PART, AND DISSENTING, IN PART: Respectfully, I dissent. A sentence to a term of years cannot be run consecutively to a life sentence, even if the term of years results from a subsequent conviction. The sentencing statute, KRS 532.110(1)(c), clearly states that *"[i]n no event* shall the aggregate of consecutive indeterminate terms exceed seventy (70) years," (emphasis added), which would bar running a term of years consecutive to a life sentence since a life sentence is presumed to be longer than any term of years. That the sentence resulted from different trials makes no difference, as KRS 532.110(1) obviously contemplates that its rule will apply to such scenarios when it refers to "a crime for which a previous sentence of probation or conditional discharge has been revoked."

The majority is no doubt concerned that the inability to run such additional sentences consecutively undermines the deterrent effect of the conviction and is thus unlikely to prevent the commission of additional crimes. This is incorrect for a number of reasons.

13

First, an additional sentence does not affect parole eligibility. Under our statutes, parole eligibility maxes out at twenty years. *See Hughes v. Commonwealth,* 87 S.W.3d 850, 855-56 (Ky. 2002). Nor would it negatively affect actual parole decisions. One might argue that the additional, consecutive sentence would send a message to the parole board, but the additional conviction itself would do just that.

Second, adding the term of years after the life sentence clearly does not (and indeed cannot) affect service of the sentence because you can't serve beyond the expiration of life. Nor can you serve out a life sentence, so there is no chance that the additional term of years could be a buffer to protect against premature release of a violent offender.

So what then is the point of running the sentences consecutively? There is no merit in imposing a sentence that defies common sense (life plus a term of years requires service from the grave), and nothing in our statutes can be construed to allow it. I would vacate the sentence and order the subsequent sentence to run concurrently with the previous life sentence.

Venters, J., joins.

COUNSEL FOR APPELLANT:


Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane
Suite 302
Frankfort, KY 40601


COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

James Coleman Shackelford
Assistant Attorney General
Office of the Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, KY 40601-8204